# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF MINNESOTA.

BENJAMIN BRESNAHAN, JR., v. BENJAMIN BRESNAHAN, SR., and
Others.[1]

December 23, 1897.

Nos. 10,739—(169).[2]

**Statute of Frauds—Oral Agreement to Sell Land—Evidence—Intent
—Possession—Parent and Child—Presumption.**

Possession of land, in order to take a verbal contract for its purchase
out of the statute, must be taken with the specific intent of carrying out
the contract. Such intent cannot be shown by the oral contract. If the
possession is not a new fact, but is a continuation of a former similar
condition, the intent must be proved by some further act which shows,
without any equivocation or uncertainty, that the possession cannot be
accounted for except by the verbal contract of purchase. Possession by
a son raises no presumption that it was taken pursuant to any contract
for the purchase of the land.

**Same—Findings Not Supported by Evidence—Part Performance.**

Evidence *held* insufficient to support the findings of the trial court as
to the making of a verbal contract for the purchase of land, and a part
performance thereof.

Action in the district court for Fillmore county by Benjamin
Bresnahan, Junior, against Benjamin Bresnahan, Senior, Kate Mc-
Carthy and her husband, to cancel a deed from Bresnahan, Sr. to
defendants McCarthy and obtain a conveyance of the land to plain-
tiff from his father. At the trial the court, Whytock, J., found in
favor of plaintiff and ordered judgment in his favor. The findings

[1] Reported in 73 N. W. 515.      [2] See note on page IV, supra.

71 M.—1

are stated more fully in the opinion. From an order denying a motion for a new trial defendants appealed. Reversed.

*P. Fitzpatrick* and *Brown & Abbott*, for appellants.

*Wells & Hopp, Gray & Thompson*, and *Bassett & Fowler*, for respondent.

START, C. J.

This is an action to enforce specific performance of an alleged oral contract between the plaintiff and the defendant Bresnahan for the sale by the latter to the former of 80 acres of land, the homestead of the defendant. The making of the contract was denied by the defendant, but the trial court found all of the issues for the plaintiff, and ordered judgment accordingly. The defendants appeal from an order denying their motion for a new trial.

The undisputed evidence establishes the following facts, among others: The plaintiff is a son of the defendant Benjamin Bresnahan, Sr., by a second marriage. His other children by this marriage are Cornelius Bresnahan and Johanna Bresnahan (now Larkin), and one other daughter. The defendant Kate McCarthy is the only child of his first marriage, and the other defendant, Dennis McCarthy, is her husband. The elder Bresnahan purchased the land in question (which, for brevity, will be hereinafter referred to as the homestead) before his second marriage, which occurred two years afterwards, and has ever since resided upon it. His daughter Kate McCarthy, because of differences between her father and her stepmother with reference to her, left home at 13 years of age to earn her own living, and never returned to her father's house, except as a visitor, until the death of her stepmother, May 17, 1895. His oldest son, Cornelius, remained at home, working with his father, until he was 24 years old, when on May 8, 1884, his father deeded him a farm of 120 acres near the homestead.

The plaintiff remained at home, working with his father until he was 21 years old, then went away and was gone for 16 months. In the meantime the father purchased a farm of 120 acres adjoining the homestead for him, the purchase price of which was $4,000. Thereupon the plaintiff returned home, and resided on the homestead until his marriage, November 26, 1888, during which time he

carried on his own farm, and practically managed and controlled the homestead. The purchase price of the farm purchased for and deeded to the plaintiff was paid—$800 by himself, $1,000 by his father, and the balance by the father and his two sons from the proceeds of their respective farms. They also purchased another farm of 80 acres, known as the "Lynch 80," for $1,800, and paid for it from such proceeds, the title being taken in the name of the plaintiff, who deeded it to Cornelius November 26, 1888, taking the latter's note for $600. The father disclaims any interest in this farm. The daughter Johanna remained at home and rendered services to her father and family until her marriage, some nine years after she was of age, for which he paid her in settlement $600 in 1895. After the death of his wife the father, who was then over 70 years of age, lived alone on the homestead, doing his own cooking and washing, for about three months, when he went to the home of his daughter Kate at Winona, and requested her to come with her husband and live on the homestead and take care of him, and he would deed the homestead to them. They subsequently came to his home, accepted his offer, and he deeded to them the homestead on August 19, 1895.

The deed contained a covenant on the part of the grantees to support and maintain the grantor during his natural life. They have been in the possession of the homestead ever since the making of the deed. The father claims that one reason for his making the deed was the fact that he received from his daughter Kate's mother the money with which he purchased the homestead. At the time the defendants the McCarthys accepted the deed of the homestead, they had notice that the plaintiff claimed to be the owner thereof.

The findings of the trial court as to the making of the alleged oral contract relating to the homestead and part performance thereof were to the effect following: That it was orally and mutually agreed, on the day before the plaintiff's marriage, between the plaintiff, his brother Cornelius and the defendant Bresnahan, Sr., and his wife, that the plaintiff should have the homestead, and in consideration therefor he should convey the Lynch 80 to Cornelius, and at once take possession of the homestead as owner, cultivate

and carry it on during the life of his father and mother, respectively give them one-third of the crops raised thereon each year, and give them the possession of and use of the dwelling house and all buildings thereon (except one-half of the granary) and the pasture thereon, as then known and fenced,—some four or five acres; that the homestead should be deeded to the plaintiff before the father died, subject to the delivery to his father and mother, or the survivor, of one-third of the crops, and the right to occupy and use such buildings and pasture during their lives; that in part performance of this contract the plaintiff made a deed of the Lynch 80 to Cornelius, and also in part performance of the contract, and pursuant thereto, took actual possession of the homestead, and has ever since had actual possession thereof, and has each year cultivated and carried on the homestead, and given to his father one-third of the crops annually, and has improved the premises, built and kept the fences in repair thereon, and manured the land from season to season, as the same required, seeded parts of the land to timothy, and broken up the timothy sod when needed, and has in every way used, treated and done with the premises as was intended by the contract.

The defendants, by proper assignments of error, raise the question that these findings as to the contract and its part performance are not sustained by the evidence, and that the supposed contract is too uncertain and incomplete to justify any relief; that there has been no such part performance as to take the contract out of the statute of frauds; and, further, that the contract is unconscionable. The conclusion reached by this court is that, as to several of such findings of fact, which are absolutely essential to support the conclusions of law of the trial court, they are not supported by the evidence.

The evidence does not warrant a more favorable finding for the plaintiff as to the contract and its terms than his version of them. His testimony on this point was substantially this:

"The Court: Just state what the arrangement was between your father and mother and you. A. Well, I was in the house at the time, sitting down,—me and De Villiers were sitting together,— and father and Con happened to come over. Q. Where was your

mother? A. She was in the house, sitting in a rocking chair, right near the stove. Father come in, and he took a chair, and sat right in front of the stove, and turned round to me. 'Now,' he says, 'I want you fellows to make a settlement before you get married.' He says to me, 'I want you to deed that eighty acres over to Con, and if you deed that over to Con—' Q. That Lynch 80? A. Yes, sir. 'If you deed that over to Con, and take this homestead, and cultivate and carry it on, and give me one-third of all that is raised on it, and pasture for a few head of stock, I will give you a deed of this 80 before I die'—and I didn't say anything for a while. Q. Now, you say your mother heard that? A. Yes, sir. Q. And she made no objections? A. No. Q. Well, what did you do then? A. I told him I would do that. Q. And then what did you do? A. He told me then. 'Well, then,' he says, 'this 80 is yours.' Q. And your mother heard that, did she? A. Yes. Q. Did she make any objections to it? A. No, sir. Q. She understood it? A. Yes, perfectly."

He was corroborated by his brother Cornelius, who testified as to the contract thus:

"Q. Go on. Tell what was done and said. A. We both went in the house together, and father says to Ben: 'You give the deed of that Lynch 80 to Con. I will deed this 80 to you before I die, if you give me one-third of the crop, the house, and a few acres for pasture as long as me and the old lady will live.'"

Also by his sister Johanna, who testified as to the contract as follows:

"The Court: State what you all said there. That is what he wants to know. A. My father told my brother Ben to go and give a deed to the Lynch 80 to brother Con, and he would deed the home 80 to him before he died. Q. Was there anything more said,—what Ben should do? A. Ben should give them one-third of the home 80—of the crops—while they lived. Q. Anything said about the buildings or anything? A. Father should have the house and the barns,—part of them. Q. Anything about the pasture? A. Yes, he was to have some pasture for his cows. Q. Well, what did your brother Ben say to that? A. Brother Ben said he would."

The record discloses no evidence that it was a part of the contract that the plaintiff should at once take possession of the homestead as owner, or that the "pasture for a few head of stock," or "a few acres of pasture," which the father was to retain, was "the pasture as then known and fenced, some four or five acres," as found by the trial court, or to show that the pasture was located

or set apart by the parties subsequent to the making of the contract; but the evidence does show that the pasture used by the father was changed from time to time. If we eliminate from the findings of the trial court as to the contract all facts not supported by the evidence, it leaves a contract too indefinite and uncertain to be enforced specifically, even if it be conceded that it is definite as to the time and manner of its performance, and fair and just as to the old father. Lanz v. McLaughlin, 14 Minn. 55 (72); Williams v. Stewart, 25 Minn. 516.

The evidence is also insufficient to support the finding and conclusion of the trial court that there was such a part performance as to take the contract out of the statute of frauds. The plaintiff did convey the Lynch 80 to Cornelius, but he took from him his note for $600,—one-third of the purchase price. The note called for interest, and bore an indorsement to the effect that, if the plaintiff got the homestead, the note was to be returned. The finding as to improvements made on the homestead shows upon its face that they were not permanent, but only such as the usual course of husbandry required. The plaintiff testified on his cross-examination as to the improvements in these words:

"Q. Were there any improvements put on the homestead 80 since you were married? A. My father said that was not necessary—to put any on. Q. Were there any improvements of any kind put on the homestead 80 since you were married? A. Not that I remember."

This leaves for consideration only the finding that the plaintiff, pursuant to the contract and in part performance thereof, took actual possession of the homestead, and has ever since been in actual possession thereof.

Possession of land under a verbal contract for the sale thereof, when delivered to the vendee by the vendor, or taken with the consent of the former pursuant to the contract, and in part performance thereof, is sufficient to take the contract out of the statute. Possession, however, must be taken with the specific intent of carrying out the contract, and the intent cannot be shown by the oral contract of the parties. If the possession is not a new fact, but is a continuation of a former similar condition, the intent must be prov-

ed by some further act which clearly shows that the possession must be accounted for by the alleged new relation. The possession must be definite and exclusive, and indicate the beginning of a new interest and be shown to be pursuant to the oral contract. There must be no equivocation or uncertainty in the case. If the possession can naturally and reasonably be accounted for otherwise than by a contract for the purchase of the land, it will not avail. The possession by a son, even if he make valuable improvements, raises no presumption that it was taken pursuant to any contract of purchase, for such a transaction generally results from the confidence existing between parent and son and is consistent with the retention of the title to the land by the father. Phillips v. Thompson, 1 Johns. Ch. 148; Pomeroy, Cont. (2d Ed.) §§ 116–121; Browne, St. Frauds, § 481.

Tested by these rules, the evidence is clearly insufficient to support the findings and conclusions in question. It is true that the plaintiff testifies in general terms that he took possession pursuant to the contract, but, as to what he did, and his relations to the homestead and his father, the evidence is practically undisputed. In considering this evidence it must be kept in mind that the father positively denies that he ever made the alleged contract, but claims that the plaintiff carried on the homestead, after his marriage, pursuant to an agreement whereby the father was to have one-third of the crops, and, further, that it is an admitted fact that the plaintiff, after the making of the supposed contract, never resided upon the homestead, and had only such possession of it as was necessary for the purpose of caring for and cropping it, which was entirely consistent with the father's claim that the plaintiff's connection with the homestead was only as a cropper for a share of the crops.

It is also to be noted that the contract did not purport to be one for the support of his parents by the son, as plaintiff claims. The only consideration for the father's promise to deed the homestead to the plaintiff, personal to himself, was the promise of one-third of the crop, which was according to the usual crop contract, except that he retained possession of the buildings and a few acres of pasture.

The undisputed evidence tends to show that the plaintiff from 1883 to the fall of 1888 lived on the homestead with his father, and farmed it, and also his own adjoining land, making no distinction between the two farms. He managed both, raised and sold the crops, paid the farm and family expenses, and the surplus went to pay for the Lynch 80, and balance due on his own land. Upon his marriage, and on November 27, 1888,—the next day after the making of the contract,—he moved from the homestead to his own farm, but continued to cultivate and crop the homestead, giving to his father one-third of the annual crops.

Such possession as the plaintiff had of the homestead, and the acts performed thereon by him, do not necessarily and unequivocally indicate the beginning of a new interest or estate in the land, or unmistakably point to an existing contract for the purchase of the homestead. But, on the contrary, they point with reasonable certainty to a continuation of the former confidential relations between father and son, and the continued managing and cropping of the homestead by the son after his marriage and removal therefrom, as before, except that in lieu of paying the family expenses of the father he gave him one-third of the crop. It follows, from our conclusion as to the finding and decision of the trial court with reference to the alleged verbal contract and a part performance thereof, that a new trial must be granted.

It is unnecessary to pass upon the remaining assignments of error, except to say that it was error to admit the statements and admissions of the wife of Bresnahan, Sr., not made in his presence, as to the making of the contract by him, and as to who was to have the homestead when she and her husband were dead.

Order reversed, and a new trial granted.