Harrison *v.* Oates.

5-2505                                              351 S. W. 2d 431

Opinion delivered December 4, 1961.

*Clark, Clark & Clark,* for appellant.

*Eddy & Eddy* and *Robinson, Sullivan & Rosteck,* for appellee.

Paul Ward, Associate Justice.    Appellant filed a complaint in Chancery asking for specific performance of an oral contract whereby Samuel C. Oates agreed to sell him a farm consisting of 285 acres of land in Conway and Faulkner Counties. Defendants were Mr. Oates and his wife, and also Morris W. Gray who claims to be an innocent purchaser of the same land from the Oates after the alleged oral contract was made.

In his answer Oates denied making the oral contract to sell; admitted writing a letter acknowledging a rental agreement, but denied that the letter constituted a contract to sell; admitted deeding the land to Gray, and; pleaded the Statute of Frauds. Gray, in his answer, admitted receiving a deed to the lands from Oates on November 25, 1958, but claims as an innocent purchaser without notice. By way of cross-complaint against Oates he asked, in case of specific performance, to recover the money paid on the purchase price and damages.

After a full hearing the trial court found that appellant "has failed to prove that he had a valid and binding contract to purchase the lands involved in this action and his complaint should be dismissed for want of equity." The court accordingly found that Gray was entitled to immediate possession under his deed from Oates. From the above decree appellant prosecutes this appeal for a reversal.

We have concluded that the trial court was in error in dismissing appellant's complaint. Numerous issues are discussed by all parties to support their relative contentions, but, under the view we have taken, it will be unnecessary to discuss most of them. After a careful examination of the entire record we think the *evidence clearly and convincingly* shows: (a) that appellant had an oral contract with Mr. Oates to purchase the land; (b) that Mrs. Oates knew or should have known of the contract; (c) that the contract was made before appellant went on the land; (d) that, relying on the contract, appellant made valuable improvements on the land; (e) that such possession and improvements preclude operation of the Statute of Frauds, and; (f) that appellant's occupancy prevented Gray from being an innocent purchaser.

*Factual Background.* Mr. and Mrs. Oates live in Little Rock and appellant lived between Martinville and Damascus in Faulkner County. In the fall of 1957 appellant went to see Mr. Oates about renting the land for the year 1958 when (as claimed by appellant) Mr. Oates

offered to sell him the farm (and also rent it for 1958) on definite terms. The farm had been overflowed in 1957. Accordingly appellant occupied the farm, improved it, paid 1/3 of crops rent, and in the fall of 1958 offered to make the agreed down payment which Mr. Oates refused. Immediately thereafter Mr. Oates deeded the farm to Mr. Gray.

(a) We are bound to conclude from the testimony that there was an oral agreement whereby Mr. Oates was to sell appellant the farm for $12,500 with the first payment of $1,000 in the fall of 1958 and the balance to be paid by installments of $1,000 each year thereafter. This was the positive testimony of appellant and it was not denied by any witness. Confirmation of appellant's contention is found in the letters written by Oates. In the first letter written on January 23, 1958 there appears the following: ''However, I do hereby agree to sell to you, and enter into contract anytime prior to Jan. 1st, 1959, at the sum and price mentioned, viz: $12,500.00 when ever you are able to make the initial down payment of $1,000.00 with annual like payments for the balance.'' The evidence further shows that appellant lived up to the agreement by offering to pay Oates $1,000 in October, 1958 and that this payment was refused by Mr. Oates. In fact, appellant stated he was ready, able and willing to pay the full amount of $12,500 at that time but it was also refused. It is undisputed that just a few days later Mr. Oates wrote appellant a letter (dated October 28, 1958) stating he had a better offer for the place from another party and that he had ''decided to let him have it.'' Later Oates deeded the land to Gray for the price of $15,000.

(b) The evidence shows that Mrs. Oates knew of and consented to her husband's agreement to *sell* the land to appellant, because she admits she either wrote or knew the contents of two letters written to appellant in February, 1958. In the first letter there appears the following sentence: ''Just hoping that you can make so much money that you'll have $1,000 at the end of the year to pay down on the place and we would go from

there on." In the second letter we find this: "Let's look forward to getting together at the end of the year on an outright deal on the whole place."

(c) In view of the next two matters to be discussed we deem it pertinent to know when the oral contract of sale was made. The undisputed evidence is that Oates' offer to sell was made before (or at least at the same time) the lease contract was made, and this date was before appellant went on the farm. The testimony of appellant, as before stated, shows it was made in the fall of 1957, before appellant took possession of the farm on or soon after January 1, 1958.

(d) The testimony clearly shows appellant made valuable improvements on the farm, in excess of what would be expected of the usual tenant. The substance of appellant's testimony relative to improvements is set out, at some length, below:

Q. "What improvements did you make on the land other than what an ordinary tenant would make?

A. "Well, I cleaned up land that I wouldn't have cleaned up at all if I hadn't had a chance to have bought it."

I cleaned up close to 30 acres on the south side of the creek where the sprouts, as big as your arm or bigger were as thick as they could stick on the ground; also cleaned around the edges of the fields where it had grown up for years—cut back from 20 to 40 feet. I figure it would have cost $300 to $400 to do that cleaning job. I also cleaned logs and "stuff" off the land that had been left by the overflow the year before. Also I graded a mile of roads on the farm which had washed so bad they were almost unusable. On the north side I cleared off and dug up oak and elm trees, some six inches in diameter, and put the land in cultivation. The land is now in a good state of cultivation. I also built a quarter of mile of fence near the house and furnished most of the wire; I put 19 acres in lespedeza for a permanent pasture, and paid about $50 for the seed, and also put

four ditches, each about 1/4 mile long, across the land for drainage. Also, I cleaned about 700 bales of rotten hay out from under the shed, and across the creek I sowed 600 pounds of seed that cost me about $100. In addition I sowed 25 acres of oats in the fall of 1958, and they are growing now.

When appellant was asked the value of all improvements he had made to the farm his estimate was around $2,500. Appellant's two sons and two other witnesses, all familiar with the farm and the improvements made, corroborated in varying degrees the testimony of appellant as to improvements.

Only two witnesses attempted to contradict appellant's testimony concerning the extent and value of the improvements. One witness who lived 3/4 of a mile from the farm stated that the county road grader made a trip over one particular road, but the others he didn't know about. Also, a brother of appellee (Mr. Oates) testified in substance:

I am acquainted with the farm, and am on the land two or three times a year—was over it ten days ago; I heard appellant's testimony about improvements.
When asked about the 30 acres in bushes and sprouts, he testified in substance:

I was fishing by the edge of the land in 1957 *before the flood*—I drove my car over the road down to the creek and saw no obstructions—the land was heavily sprouted, and they are still there; I know nothing about the lespedeza land; I did see 17 acres of oats—I have not traveled the road since the 1957 flood; I didn't know the condition of the fence rows before appellant went on the place but they are clear now; appellant did some work there, but I didn't see any new fences.

All the testimony indicates, with nothing to the contrary, that appellant made these extensive improvements in reliance on Oates' agreement to sell. Appellant makes the positive statement that this is true, and no one disputes it. Moreover, Mr. Oates is bound to have known

his conduct might have misled appellant into thinking he could make the improvements with impunity, and thereby, he would stand to profit by such deception. In a letter from Mr. Oates to appellant, dated January 23, 1958, there appears this significant sentence: ''This assures you of being able to looking forward to buying the place, and puts you in position [to] make any improvements or repairs this year that you want to without possible sacrifice.''

(e) The vital question for decision is whether appellant's action in this case is barred by the Statute of Frauds. We have concluded that it is not under the facts and circumstances of this case. In reaching this conclusion we by-pass a decision on whether the three letters heretofore referred to constitute sufficient memoranda to circumvent the statute. Appellant contends the letters do and appellees take the opposite view. The reasons upon which we base our announced conclusion are set out below:

The Statute of Frauds, which is Ark. Stats. § 38-101, in all parts pertinent here, reads:

''No action shall be brought . . . to charge any person upon any contract for the sale of lands . . . unless the . . . contract upon which such action shall be brought, or some memorandum or note thereof, shall be made in writing, and signed by the party to be charged therewith. . . .''

Since the early case of *Pindall et al.* v. *Trevor & Colgate,* 30 Ark. 249, this Court has consistently held that the delivery of possession under an oral contract for the sale of real estate will take the case out of the Statute of Frauds. We do not cite other cases because we understand appellees recognize this general rule of law. This Court also recognizes that a significant equity aspect arises where the one in possession makes improvements on the land. This is obvious, otherwise the owner would be in position to reap unjust benefits. In the case of *Moore* v. *Gordon,* 44 Ark. 334, 342, the court quoted, with approval, this statement:

"the making of valuable improvements on the land by the vendee or lessee, in pursuance of the agreement, and with the knowledge of the other party, is always considered to be the strongest and most unequivocal act of part performance by which a verbal contract to sell and convey, or to lease is taken out of the statute."

See also: *Young* v. *Crawford,* 82 Ark. 33, 100 S. W. 87: *Murphy* v. *Graves,* 170 Ark. 180, 279 S. W. 359; *Hunt* v. *Boyce,* 176 Ark. 303, 3 S. W. 2d 342, and *Dillard* v. *Kelley,* 205 Ark. 848, 171 S. W. 2d 53.

We think the rule above announced takes this case out of the statute. We are not unmindful of appellees' strong insistence that appellant went into possession solely as a tenant and not under an oral contract to purchase. If the facts were as contended by appellees their contention would have to be conceded. However, as we have already set out, that is not the factual situation here. Trying this case *de novo* we find that appellant took possession of the farm not only as a tenant but also under an oral contract to purchase and that he, as a purchaser, with the knowledge and sanction of Mr. Oates, made valuable improvements thereon. There is no logical or sensible reason why a court should recognize the rental agreement to the exclusion of the purchase agreement.

Almost the exact situation obtaining here was presented in the case of *Grant et al.* v. *First Nat. Bank of City of Superior et al.,* 224 Wis. 463, 272 N. W. 363. There the purchaser was originally in possession solely as a tenant, but later the owner orally agreed to sell him the land. After that the purchaser made certain improvements, relying on the oral promise. The Court posed the issue as follows:

"The only question is whether, since the Grants were at the time of this contract in possession as some sort of tenants, their continued possession can be considered to be referable solely to the oral contract."

The Court then held the improvements were referable to the oral agreemnt to sell, and took the agreement out of the Statute of Frauds.

Also in the case of *Herbstreith et al.* v. *Walls et al.*, 147 Neb. 805, 25 N. W. 2d 409, there appears this statement:

" 'Thus, in cases where a tenant continues in possession under an alleged agreement for a new tenancy, the purpose is answered by proof of any act on his own part, done with the privity of the owner of the fee, which is inconsistent with the previous holding, and is such as clearly indicates a change in the relation of the parties— as when he makes improvements upon the premises, this fact is of great weight to show a change in the holding.' *Underwood* v. *Underwood*, 48 Mo. 527. See *Bresnahan* v. *Bresnahan*, 71 Minn. 1, 73 N. W. 515."

(b)   Finally, again trying the case *de novo* we are bound to deny Gray's claim to be an innocent purchaser. Under well established principles of law Gray was charged with the knowledge that appellant was in possession of the farm. It was his obligation to inquire of appellant the nature of such possession. This he failed to do. He did not contact appellant until after he received his deed from Oates, and he was then advised of appellant's interest in the farm.

Particular attention should be given to one of appellees' contentions. In the first letter Mr. Oates wrote appellant, dated January 23, 1958, there appears this paragraph:

"I have been studying a lot about our land deal since I was up there a few days ago. It has been hard for me to decide just what I want to do in the matter of selling, yet I do prefer to sell. But I have come to this decision, i. e., *we will not enter into any definite contract, in writing, as to the sale at this time.*"

Appellees attach much significance to the sentence we have emphasized, contending it shows there was no oral agreement to sell. In our opinion, however, this sentence must be construed together with other written statements later made by Mr. Oates. When so construed the conclusion is inescapable that Mr. Oates did agree to

sell the farm to appellant for a fixed sum on definite terms of payments. The facts and circumstances have already been enumerated. The subsequent written statements (in the letters) are, in substance, as follows: (a) In the first letter he said, "I do hereby agree to sell to you"; (b) Further on in the same letter he told appellant he could make improvements "without possible sacrifice"; (c) In the second letter (written 16 days after the first letter) he said he hoped appellant would be able to make the $1,000 down payment on the place by the end of the year; and, (d) In the last letter (written one week after the second letter) he said to appellant they would be looking forward to making "an outright deal on the whole place." So, even though Mr. Oates was not ready to make a *written* contract in January, 1958, he clearly shows that his intention was to make an *oral* agreement to sell, conditioned only on appellant's being able to make the down payment, which payment appellant offered to make even sooner than the date fixed by Oates. For us to reach any other conclusion would amount to lending the offices of a court of equity to assist in perpetrating deception.

The decree of the trial court is accordingly reversed, and the cause is remanded for the entry of a decree in accordance with this opinion, and also for any other necessary proceedings relative to Gray's cross-complaint.

Reversed and remanded.

ROBINSON, J., not participating.

McFADDIN and JOHNSON, JJ., dissent.

ED. F. McFADDIN, Associate Justice, dissenting. The Trial Court found that the appellant "has failed to prove that he had a valid and binding contract to purchase the lands involved in this action . . ."; and with that finding of the Trial Court I thoroughly agree. I summarize my reasons for dissenting.

(1) Mrs. Oates did not sign anything, and the proof is insufficient to show that she, in any way, authorized or

empowered her husband to bind her, or ratified, in any way, any sale contract as claimed by appellant. I cannot see how she can be held to specific performance.

(2) Harrison's possession of the land was as a tenant and not as a purchaser; so his possession is not such part performance as would take the contract out of the Statute of Frauds. In order for possession to take the contract out of the statute, the possession must be delivered solely under the oral contract of purchase. In this case, Harrison went into possession as a tenant and not as one who had purchased the property. Furthermore, improvements do not take a contract out of the Statute of Frauds. Therefore, I find no merit in the claim of possession, part performance, and/or improvements.

(3) Coming, then, to the correspondence as constituting a definite contract, on which to support the action for specific performance, I am thoroughly convinced that the correspondence is entirely insufficient to support the claim. See *Kromray* v. *Stobaugh,* 212 Ark. 377, 206 S. W. 2d 171; and *Wyatt* v. *Yingling,* 213 Ark. 160, 210 S. W. 2d 122. The writings relied on by the appellant as sufficient to take the case out of the Statute of Frauds are Oates' letters of January 23, 1958 and February 6, 1958. I copy these in full, with the exception of one paragraph in the second letter:

"Little Rock, Ark.
Jan. 23rd 1958

"Mr. Worth Harrison and two Sons
R. F. D. No. 2
Damascus, Ark.

"Gentlemen:

"I have been studying a lot about our land deal since I was up there a few days ago. It has been hard for me to decide just what I want to do in the matter of selling, yet I do prefer to sell. But I have come to this decision, i. e., we will not enter into any definite contract, in writing, as to the sale at this time.

"However, I do hereby agree to sell to you, and enter into contract, anytime prior to Jan. 1st 1959, at the sum and price mentioned, viz: $12,500.00, when ever you are able to make the initial down payment of $1000.00 with annual like payments for the balance. For the year 1958, I give you your choice standing rent of $350.00, with your receiving all government soil bank payments for corn and cotton acreage with my having no part of fertilizer expense. Alternate plan, my sharing third and fourth with you on all marketable products, with your being responsible for the marketing or sale into cash of the products.

"This assures you of being able to looking forward to buying the place, and puts you in position (to) make any improvements or repairs this year that you want to without possible sacrifice. Might inform you that the amount (of) standing rent, $350.00, is a bargain for I received over $500.00 in 1957 rent, notwithstanding the loss by flood. But I am doing this to help you make the DOWN payment this fall or when we close the deal. That is, I'm making the rent for this year less than it ought to be. My rent for last year would have been $750.00 or $1000.00, had it not been for the flood.

"I hope you folks are all well, and that I have made all the above understandable. As for the rent plan, I will expect you to make a choice by early spring or planting time. So I will know which plan you are operating on.

"With best wishes, I am,

"Yours truly
/s/ Sam'l C. Oates"

"Little Rock, Ark.
Feby 6th 1958

"Mr. Worth Harrison
RFD No. 2
Damascus, Ark.

"Dear Mr. Harrison:

"Just received your letter of yesterday and now I'm a bit confused about our deal.

"In my recent letter I made you a flat offer of $350.00 for the entire farm for standing rent (cash) or I would take the 3rd and 4th of the production and you market the same f. o. b. Damascus or any other point. You to take your choice of the two methods. I was making you the excessively low cash rent in order to help you have more cash money at the end of the year to make the down payment. As (I) told you, I got over $500.00 rent off the place last year and it wasn't half a crop year. Yes, I would like to sell the place and am still figuring on you taking it at the end of this year. But this year it is on a rent basis.

(Paragraph omitted which consists solely of discussion of governmental agricultural regulations.)

"Kindly let me hear from you a little more fully about the 26 (acre) limitation. I am willing to let you have the place on a 3rd and 4th basis but the 3rd and 4th is my rent for the use of the land for the year. Just hoping that you can make so much money that you'll have a $1000. at the end of the year to pay down on the place and we would go from there on. That was my understanding of your proposition. If you haven't made the $1000, then we don't have to enter into a contract.

"Hoping that you will give me a reply by return mail, as I have done, I am,

"Yours very truly,
Sam'l C. Oates
3122 W. 12th St.
Little Rock, Ark."

It will be observed that in the letter of January 23, 1958, Oates begins by saying: "We will not enter into any definite contract in writing as to the sale at this time." All the remainder of that letter was a mere discussion of what *might* be the basis of subsequent negotiations. The letter of February 6th relates largely to rent matters. So I confidently assert that there is no written contract sufficient to take the case out of the Statute of Frauds, and I think the Majority Opinion in

the present case is in the teeth of *Kromray* v. *Stobaugh* and *Wyatt* v. *Yingling, supra.* I, therefore, respectfully dissent.