BRANDT POORE, EXECUTOR v. FLOYD SLAUGHTER, ET AL

4612                                                    431 S.W. 2d 837

Opinion Delivered September 16, 1968
[Rehearing denied October 21, 1968.]

*Mahoney & Yocum* for appellant.

*Don Gillaspie* for appellees.

CONLEY BYRD, Justice.    Appellant, Robert H. Poore, appeals from a decree directing specific performance of an oral contract for the conveyance of timber. The trial court held that the payment of the consideration and the partial performance by appellees, Floyd Slaughter and Larry Don Slaughter, d/b/a Slaughter & Son, was sufficient to take the oral contract out of the statute of frauds, Ark. Stat. Ann. § 38-101 (Repl. 1962).

For reversal, Poore contends that the testimony was insufficient to establish an oral contract and that

there was no part performance. Since we find that the record is insufficient to establish the oral contract by clear and convincing evidence, we do not reach the issue of partial performance.

The record shows that Mr. Floyd Slaughter, a resident of Union County, on January 20, 1966, phoned Robert H. Poore, Sr., at his home in Council Bluffs, Iowa, to buy timber on 500 acres of land owned by Poore in Union County, Arkansas. Slaughter does not contend that an agreement was reached that day, but that Poore said he would have to contact his cousin, Wesley Poore, of El Dorado, Arkansas. Slaughter testified that, following telephone conversations between appellant Poore and Wesley Poore and Slaughter, he and Poore on the 21st day of January entered into a binding contract for the purchase of all pine above eight inches and all hardwood above twelve inches except in the areas around the home place and the deer camp. According to Slaughter, the price of $4,000 was agreed upon, the time for cutting the timber was for one year from January 21, 1966, and both parties understood the area to be cut.

On January 21, 1966, Slaughter wrote to Poore:

"Enclosed you will find two copies of the timber deed; Sign and return one copy—

Also enclosed, a check for four thousand.

Appreciate getting the timber and will look forward to meeting you in person."

On January 24, 1966, Slaughter commenced cutting the timber.

On January 26, Poore phoned Slaughter that he had received the check but not the deed. Slaughter suggested to Poore that the check be sent on through.

On January 27, Slaughter mailed to Poore a form deed, filled in to describe the timber to be cut as "all

the Pine & Hardwood timber standing, growing and being eight inches in diameter and over at the stump..." (Slaughter had discovered that the deed had been omitted from the January 21 transmittal through his secretary's error.)

On January 29, Poore called Slaughter to tell him that someone was trying to buy the land from him but that the man didn't want to buy the land without the timber. When Slaughter told Poore that he was a little late, because he had already started cutting, Poore told Slaughter that he had "jumped the gun." Slaughter continued to cut the timber until he was served with a restraining order on February 18.

Poore's version of the January 21 conversation is that he and Slaughter both knew what land was covered, but with reference to the other essential facts he testified on cross examination as follows:

"Q. Was there any doubt as to how much money he was offering you for the timber on it?

A. He offered $4,000 for it.

Q. And if you were going to deal you would accept that $4,000 if you were going to sell it to him?

A. I would accept when my attorney checked into it.

Q. If he approved the form of the timber deed?

A. If he approved the timber deed."

\* \* \*

"Q. And in this conversation on the 21st, did you not agree that it was to be eight inches on the pine and twelve inches on the hardwood?

A. That seems to be the direction.

Q. That is pretty well standard, isn't it?

A. Yes.

Q. Then, all this timber deed was going to do, Mr. Poore, all it was going to be, wasn't it, was just a reduction of your agreement to writing, you all had agreed he was going to purchase the timber, eight inches on pine and twelve inches on hardwood on all the 500 acres, you all knew which, for four thousand dollars, and he was going to have one year from January 21st, 1966, to cut it?

A. It all depended on how my attorney looked at it.

Q. If your attorney approved the form of the deed?

A. If he agreed to the timber deed.

Q. But you all had agreed as to all the terms included in that deed?

A. Yes.

Q. And all he had to do was approve the form and then you would sign it and send it back and take the money and he would have the timber?

A. Yes, as soon as the timber deed was approved, that is what we wanted, a written agreement, a timber deed.''

In *Hudspeth* v. *Thomas,* 214 Ark. 347, 216 S.W. 2d 389 (1949), we pointed out that one seeking to take an oral contract for conveyance of land out of the statute of frauds through partial performance has the burden of proving by clear and convincing evidence both his oral contract and his partial performance thereunder.

Here the proof of the oral contract is not clear and convincing. Poore's testimony is that he wanted the deed to secure his attorney's approval. It is here that perhaps some the testimony could be read as saying that the only purpose of submitting the deed to the attorney was to get his approval of form only, but when such testimony is considered in the light of Poore's conduct in holding the check until he received the deed, we do not find it to be sufficiently clear and convincing to show Poore's assent to the alleged contract.

For the reason stated we are reversing the decree of specific performance and remanding the same to the trial court with instructions to enter an injunction and judgment for damages to which Poore is entitled.

The record contains some evidence on the damages sustained by Poore, but under the record here presented we prefer that the matter be considered first by the chancellor.

Reversed and remanded.

WARD, BROWN & FOGLEMAN, JJ., dissent.

LYLE BROWN, Justice. The record contains the chancellor's "Findings of Fact and Conclusions of Law." Specifically, it was found that an oral contract was entered into on January 21 which showed a meeting of the minds on every point. Included were these items: The date was fixed on which cutting was to begin; the contract was for one year; the diameter was eight and twelve inches; the price was four thousand dollars; Slaughter was to send Poore a deed which would be corrected as required by Poore's attorney to reflect the oral agreement; the certainty of the area of the timber conveyed was clearly understood; and, pursuant to the agreement, Slaughter sent a check and deed, entered into possession, and cut timber throughout the tract. The trial court found that Poore knew, on January 26, that Slaughter was well into the cutting opera-

tion.   Finally, he concluded that the reason Poore tried to rescind the contract was the receipt of what Poore considered a better offer.

I am convinced, as was the chancellor, that the execution of the deed was a mere formality which would (1) reduce the agreement to writing, which was good business, and (2) enable the transaction to be recorded. Yet it is evident to me that the sale would not have been affected if Poore had decided he would not go to the expense of revising the deed because the transaction was already complete as between the parties.

Poore and Slaughter were the only witnesses to the January 21 conversation.   Naturally the credibility of these witnesses was vital.   The weakness in Poore's credibility lies in the fact that he first insisted that the discussion on January 21 never occurred!   Here is his initial version:   Slaughter called Poore on January 20; the men talked only in general terms; Poore told Slaughter to send a timber deed and a check for $4000, which would prove Slaughter meant business; there was no subsequent call to him by Slaughter; the next contact was by Poore when the check arrived without the deed; and that there was no agreement of any kind as to specifics because he was waiting for the deed. The foregoing is gleaned from Poore's discovery deposition. Then when the case was tried, Slaughter produced his telephone bill showing his having called Council Bluffs on January 21.   That evidence seemed to refresh Poore's memory and on cross-examination he conceded the conversation and the meeting of the minds on every phase of the transaction as recited by the chancellor.   His one reservation was that he at no time intended to consummate the sale until his lawyer had examined and approved the deed.   The evidence appears to be clear and convincing.   Certainly I cannot agree that the trial court, from his vantage point, erred in so finding.

It is insisted that the majority opinion cannot stand the light shed by *Harrison* v. *Oates,* 234 Ark. 259, 351

S.W. 2d 431 (1961). The facts in *Harrison*, which were approved as supporting an oral sale of lands, are not nearly so clear and convincing as the facts in the case at bar.

I would affirm.

WARD and FOGLEMAN, JJ., join in this dissent.