*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2196**

James F. Christie,
Appellant,

vs.

Estate of Dilman Christie, et al.,
Respondents,

Charles Christie, et al.,
Defendants.

**Filed October 5, 2015
Reversed and remanded
Rodenberg, Judge
Dissenting, Harten, Judge**[*]

Fillmore County District Court
File No. 23-CV-13-70

Adam J. Houck, Paul V. Sween, Adams, Rizzi & Sween, P.A., Austin, Minnesota; and Ryan B. Magnus, Jones and Magnus, Mankato, Minnesota (for appellant)

Ken D. Schueler, Kari C. Stonelake-Hopkins, Dunlap & Seeger, P.A., Rochester, Minnesota (for respondents)

Considered and decided by Ross, Presiding Judge; Rodenberg, Judge; and Harten, Judge.

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**RODENBERG**, Judge

Appellant, transferor of certain real property, challenges the district court's grant of judgment as a matter of law (JMOL) in favor of respondents on appellant's claim that, pursuant to an oral agreement, he is entitled to recover the property. We reverse this grant of JMOL and remand because the evidence, when viewed in the light most favorable to appellant as the non-moving party, sufficed for a reasonable jury to find that the oral agreement alleged by appellant did exist. Because the district court misapprehended appellant's statute-of-frauds argument, and analyzed only the post-transfer actions of appellant in reliance on the alleged oral agreement, we also reverse and remand the district court's alternative grant of JMOL based on the statute of frauds.

## FACTS

The late Dilman Christie and his adult sons, James Christie and Charles Christie, were all farmers. In 2004, James found himself in financial trouble. He was in default on several loans, including his farm-operating loan. After exploring other alternatives, James sold five parcels of agricultural real property (the property), then valued at $1.2 million,[1] to his parents, Dilman and Dorothy Christie. Dilman and Dorothy borrowed $598,565 from AgStar Financial Services (AgStar) to acquire the property, secured their loan with a 25-year mortgage, and used the loan proceeds to pay James's obligations. James received nothing for the property other than the payment of his preexisting debt.

---

[1] While the district court made no finding of the value of the property as of its 2004 transfer, James testified that the property was then worth about $1.2 million.

2

James asserts that, as part of this conveyance, he had an oral agreement with Dilman under which the property would be returned to James when the AgStar mortgage was satisfied. James also asserts that Dorothy, although not a party to this oral agreement, acquiesced to it.

In the 2004 crop season, James leased most of the property from his parents under a written lease. In 2005, he leased all of the property's tillable acreage for $56,875 under a one-year written lease. In 2006, he leased it under a five-year written lease. In 2006, James began subletting the property for more money than he owed his parents under the lease, and kept the surplus rent for himself. The lease between James and his parents was renewed orally for one year in 2011 and again in 2012. James's lease payments went into his parents' bank account, from which they made the mortgage payments to AgStar.

Beginning in 2007, and in addition to paying his parents under his lease of the property, James began making payments directly to AgStar on his parents' mortgage note. To do so, James used checks from third parties that were either made out to and endorsed by James, or were made out directly to AgStar. A total of $184,297 was paid on the mortgage with these checks. These payments were applied to principal, and the record contains no written agreement addressing why these additional payments on his parents' mortgage note were made by James.

In April 2012, James directed his attorney to prepare quitclaim deeds for his parents to transfer the property back to James, subject to the AgStar mortgage. Dilman and Dorothy signed the deeds, despite the fact (as found by the district court and not challenged on appeal) that Dilman lacked contractual capacity at the time. It is agreed

3

that the AgStar mortgage had not been satisfied when these deeds were signed. But, in May 2012 and at the direction of James, the entire mortgage was satisfied by a payment of $299,992 from the law firm of James's attorney. James argues that, under the terms of the oral agreement he had with his parents, the property should have passed back to him at that time.

In June 2012, Dilman died. His will left his interest in the property to Dorothy. James brought this action against Dilman's estate, asserting that that the oral agreement provided that all of the lease payments he made were to be applied to the mortgage; that the property should have been transferred to him in May 2012 when the AgStar mortgage was satisfied; and that the quitclaim deeds were evidence that the oral agreement existed. Dilman's estate counterclaimed to rescind the quitclaim deeds, denied the existence of any oral agreement, and argued that the statute of frauds barred James's claims.[2]

In January 2014, Dorothy died. Her estate was then added as a defendant in James's suit. In a deposition taken before she died, a videotape of which was played at trial, Dorothy testified that she had no oral agreement with James, and was unaware of any oral agreement between Dilman and James.

At the close of James's case-in-chief, the estates of Dilman and Dorothy (respondents) moved for JMOL on the issue of the validity of the April 2012 quitclaim deeds to James. The district court determined that the quitclaim deeds were invalid and ordered that those deeds be rescinded.

---

[2] James also sued his brother Charles, and Charles's wife. These claims were resolved before trial, and Charles and his wife take no part in this appeal.

4

Respondents then moved for JMOL on the issue of whether James's claims were barred by the statute of frauds. The district court denied that motion. But when respondents rested after all of their evidence had been received, the district court revisited the question of whether to grant JMOL, and granted JMOL on two alternative bases.

First, the district court in its written order ruled that there had not been an oral agreement, or a meeting of the minds, between James and his parents. The district court based this ruling on the following findings of fact it made regarding evidence it believed was inconsistent with the existence of the oral agreement alleged by James:

> 7. James Christie testified it was his understanding . . . [that] Dilman Christie agreed to transfer the land back to him once the AgStar mortgage was satisfied. No writing exists reflecting the agreement. No similar oral agreement existed with Dorothy Christie. James believed Dorothy acquiesced to his oral agreement with Dilman. Dorothy testified she had no such agreement with James.
>
> . . . .
>
> 11. James Christie acknowledged the [2004] Codicils [to Dorothy's and Dilman's wills] are inconsistent with his understanding of the oral agreement with Dilman Christie. . . . Dilman and Dorothy Christie providing [James with] an option to purchase [the property] in their wills is inconsistent with what James Christie alleged the oral agreement was.
>
> 12. . . . James Christie's possession of the property [from 2004 to 2011] was pursuant to the terms of . . . written leases and not pursuant to any other written or oral agreement between the parties.
>
> . . . .
>
> 15. . . . [Dilman and Dorothy's tax accountant] was not aware of any oral agreement as alleged by James Christie. Such an agreement would have been specified in the

5

Christies' joint income tax returns and reported to the Internal Revenue Service. Their tax returns do not reflect such an agreement. . . .

16. [The same tax accountant] prepared income tax returns for James Christie for years 2005-2009. . . . [He] testified that an agreement to purchase the Property back from [Dilman and Dorothy] for the AgStar mortgage amount would have been reported to the Internal Revenue Service on [James's] tax returns. [The tax accountant] was not aware of the alleged agreement and no such agreement was reported on James Christie's tax returns. . . .

. . . .

20. [An] AgStar [loan officer] testified that he routinely visited with Dilman Christie following January 2004. . . . [He] had no knowledge of any agreement to transfer the Property to James following satisfaction of the AgStar mortgage.

. . . .

23. Dilman Christie's 2011 Will stated in part that in the event Dorothy Christie did not survive him that he granted Charles Christie the option to purchase all or a part of two parcels of the Property for fair market value, as determined by an independent appraiser. The will also granted James Christie the option to purchase all or a part of two different parcels of the Property for fair market value, as determined by an independent appraiser. . . . [This is] further evidence that there was no oral agreement with James Christie . . . [because] this provision allows part of the Property to be sold to someone other than James Christie.

. . . .

25. [Dilman and Dorothy's attorney] testified that he . . . received financial statements from AgStar related to Dilman and Dorothy Christie. No agreement to transfer the Property to James Christie was reflected in the financial information provided. [He] testified that as their estate planning attorney, he was not aware of any agreement between James Christie

6

and Dilman and Dorothy Christie to transfer the Property to James following satisfaction of the AgStar mortgage. Such an agreement would have been reflected in their estate plan and was not.

Concluding that "the probative evidence demonstrates there was no 'meeting of the minds' . . . concerning the voluntary transfer of the Property back to James Christie following satisfaction of the AgStar mortgage," the district court granted JMOL in favor of respondents regarding the nonexistence of the oral agreement alleged by James.[3]

Alternatively, the district court based its grant of JMOL on its determination that the statute of frauds precluded enforcing any oral agreement that may have existed. In doing so, the district court also ruled that James's claims were within the ambit of the statute of frauds. Minn. Stat. § 513.05 (2014). The district court went on to note that the equitable doctrine of part performance can remove a transaction from the statute of frauds, but further ruled that this doctrine was unavailable to James because "[t]here was no evidence, nor any allegation, that James would incur unjust and irreparable injury in the event the statute of frauds was applied."

The district court awarded James "damages in the amount of $484,270.92" on his unjust-enrichment claim, calculating the amount as the sum of James's "early principal payments" ($184,279.27) on his parents' AgStar mortgage note plus the amount paid by James in final satisfaction of that mortgage ($299,991.65).

---

[3] The district court's findings of fact are very thorough. The district court carefully considered and weighed all of the evidence, but its thoughtful order evidences numerous instances of fact-finding on disputed issues, as discussed below.

7

James now challenges the JMOL based on the nonexistence of the oral agreement and on the statute of frauds. He argues that the evidence, when viewed in the light most favorable to him as the nonmoving party, could allow a reasonable jury to find that an oral agreement existed for his parents to re-convey the property to him. James also argues that his conveyance of the property to his parents for less than full value—as well as his payment of their obligation to repay the AgStar mortgage note—satisfies the requirements of the part performance doctrine to remove the claimed oral agreement from the operation of statute of frauds. James does not challenge the district court's first JMOL rescinding the April 2012 quitclaim deeds.

## D E C I S I O N

James's claim to the property arises from what he alleges is the oral agreement between himself and his parents, which he claims was fully performed by May 2012 when he paid off his parents' AgStar mortgage note. When in doubt, "the existence and terms of a contract are questions for the fact finder." *Morrisette v. Harrison Int'l Corp.*, 486 N.W.2d 424, 427 (Minn. 1992). The district court, finding facts inconsistent with the claimed oral agreement, granted JMOL for respondents based on its determinations that no agreement existed, and that the statute of frauds precluded any agreement that did exist from being enforced.

JMOL should be granted only in unequivocal cases when, "in light of the evidence as a whole, it would be the duty of the trial court to set aside a contrary verdict as manifestly contrary to the evidence or to the law." *American States Ins. Co. v. Ankrum*, 651 N.W.2d 513, 521 (Minn. App. 2002) (quotation omitted); *see* Minn. R. Civ. P. 50.01

8

(2015) (providing for JMOL). "Viewing the evidence in a light most favorable to the nonmoving party, [appellate courts] make[] an independent determination of whether there is sufficient evidence to present an issue of fact for the jury." *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 (Minn. 2006).

## I

It is undisputed that, in January 2004, James conveyed to his parents property then thought to be worth about $1.2 million. It is also undisputed that, in return, he received nothing beyond his parents' payment of $598,565 of his debt. It is further undisputed that before either of his parents died, James made the payments under his leases of the property, and paid over $484,000 of additional principal on his parents' loan—$184,297 by the third-party checks, and an additional $299,992 from his attorney's trust account. Other than James's claim that he made these additional payments because of his oral agreement with his parents, the record shows no reason why James made payments on a note to which he was a stranger. We conclude that, when this evidence is viewed in the light most favorable to James, a reasonable jury could find that an oral agreement exists just as alleged by James. A reasonable jury might find that the alleged oral agreement is the best explanation for why James would sell the property to his parents for about half of its market value and then pay off the loan that they took out to complete the sale.

To be sure, this record also contains considerable evidence that could be seen to weigh against the existence of the agreement alleged by James. This evidence was recited by the district court in its grant of JMOL on the question of the existence of the agreement. But on a motion for JMOL, the district court is not to weigh the evidence and

make findings of fact where the evidence is disputed. *American States Ins. Co.*, 651 N.W.2d at 522. Rule 50.01 is clear that JMOL is proper only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the non-moving party.

On appeal from a grant of JMOL, appellate courts do not determine whether the record could support a district court's findings on disputed issues of fact. Instead, we independently determine whether the record contains sufficient evidence to allow a reasonable jury to find for the non-moving party. *Jerry's Enters., Inc.*, 711 N.W.2d at 816. While this record could allow a jury to find that there was no agreement under which Dilman and Dorothy would re-convey the property to James after James paid the principal amount of the AgStar mortgage, it could also allow a reasonable jury to find that the oral agreement alleged by James did, in fact, exist. When viewed in the light most favorable to James, the record is sufficient to support a finding that there was such an agreement, and we must conclude that, while the district court may have correctly predicted the result a jury would have reached if allowed to address the question, it erred in granting JMOL and taking that question from the jury.

**II**

The district court alternatively ruled that JMOL for respondents was appropriate for the additional reason that Minn. Stat. § 513.05 precluded James from enforcing any oral agreement the parties had. Under Minn. Stat. § 513.05, a contract for the sale of land is "void" if it is not "in writing and subscribed by the party by whom . . . the sale is to be made." In granting respondents JMOL based on the statute of frauds, the district court

10

ruled that James's "[p]art performance [under the oral agreement] does not remove the alleged contract from the statute of frauds in this case."

The district court correctly noted that part performance of an agreement can take an agreement out of the statute of frauds because either (a) the plaintiff detrimentally relied on the agreement by changing his position to a degree that will cause plaintiff unjust and irreparable injury if the defendant is allowed to invoke the statute of frauds; or (b) the parties' relationship, as shown by their actions, cannot be adequately explained without reference to the agreement between them. *See Burke v. Fine*, 236 Minn. 52, 55-56, 51 N.W.2d 818, 820 (1952) (describing these alternative bases for removing an agreement from the statute of frauds); *Brown v. Hoag*, 35 Minn. 373, 376, 29 N.W. 135, 137 (1886) (noting that principles of equitable estoppel preclude a party from asserting a statute-of-frauds defense if the party against whom the defense will be asserted detrimentally relied on an agreement by performing enough of the agreement to cause "an unjust and unconscientious injury and loss" if the agreement is disregarded).

**A. Detrimental reliance**

Generally, whether a party detrimentally relies on an oral agreement is a question of equity and is for the district court to decide. *Hoag*, 35 Minn. at 378, 29 N.W. at 138-39; *see Onvoy, Inc. v. ALLETE, Inc.*, 736 N.W.2d 611, 615 (Minn. 2007) (stating that "[n]o right to a jury trial attaches to claims for equitable relief"); *see also Kociemba v. Kociemba*, 146 Minn. 62, 64, 177 N.W. 927, 928 (1920) (stating that specific performance of an oral agreement to convey land is proper only if "clearly proved to the satisfaction of the court and its terms are definite and certain").

11

Here, the district court granted JMOL on the detrimental-reliance prong of the statute-of-frauds question, stating that there is "no evidence, nor any allegation, that James would incur unjust and irreparable injury in the event the statute of frauds was applied." The record, however, leaves no doubt that James *alleged* that he would be unjustly and irreparably harmed if the statute of frauds precludes specific performance of the claimed oral agreement.[4] In ruling that James would not be irreparably injured, the district court focused on events and payments occurring *after* James's 2004 conveyance of the property to his parents. But James's claims of detrimental reliance begin with his transfer of the property to his parents *in the first instance*. Because the district court's analysis focused on the post-transfer period, that analysis omits consideration of James's assertion that integral to the initial transfer was the oral agreement that he would transfer the property to his parents if they would transfer the property back to him when the AgStar mortgage was satisfied. Based on James's claims, the terms of the initial 2004 transfer are central to determining whether James detrimentally relied on the claimed oral agreement. The district court's failure to include the detriment to James of the initial transfer of the property in its detrimental-reliance analysis renders that analysis

---

[4] The dissent correctly notes that James's complaint did not allege detrimental reliance on an oral agreement sufficient to preclude application of the statute of frauds. The statute of frauds is an affirmative defense. Minn. R. Civ. P. 8.03 (2015). We are aware of no authority requiring a plaintiff, in his complaint, to anticipate and allege the inapplicability of affirmative defenses which, at the time of the complaint, are unasserted. Further, despite the complaint not specifically alleging why James made the additional principal payments on his parents' AgStar loan, we construe pleadings "to do substantial justice." Minn. R. Civ. P. 8.06 (2015). Fairly construed, James's complaint functionally alleges that he made additional principal payments *because of* the alleged oral agreement. Moreover, the way the proceedings developed in district court resolved any ambiguity on this point in favor of this reading of the complaint.

incomplete. Given the discrepancy between the purported value of the property at the time of conveyance and the amount for which it was conveyed, the failure to consider the initial conveyance is not, on this record, harmless.

We also note that, in its analysis, the district court relied in part on Dorothy apparently not having been a party to any oral agreement between Dilman and James. Detrimental reliance on an oral agreement, however, can operate to remove an oral agreement from the statute of frauds, even as against persons not parties to the agreement. *See Hoag*, 35 Minn. at 376, 29 N.W. at 138 (holding that "any act which the party to the contract might have asserted and relied on may be asserted and relied on by those claiming under him"). Even if Dorothy was not aware of any oral agreement, that fact does not, by itself, require application of the statute of frauds.

## B. Relationship of the parties

The district court also rejected the idea that the parties' relationship cannot be explained except by reference to some oral agreement. It did so by accurately observing that James's post-2004-transfer occupancy of the property could be explained by reference to the written and oral leases of the property to him by his parents. But even if this is true, it does not explain why James transferred the property to his parents for roughly half its (perceived) value, or why he paid the principal balance of his parents' mortgage note in addition to making his payments under the lease(s). Denial of equitable relief from the statute of frauds requires a robust analysis of the entirety of the parties' actions concerning the property and whether their overall relationship and dealings can be explained only by reference to the claimed oral agreement.

13

## C. Conclusion

Because the district court seems to have misapprehended James's argument regarding the statute of frauds, we must reverse the JMOL on that question.[5] On remand, whether the oral agreement alleged by James actually existed must be addressed—that is a disputed issue of material fact. If the jury finds as a matter of fact that the parties had no oral agreement, then of course there is no agreement on which the statute of frauds can operate. If, however, an agreement did exist, the terms of that agreement and whether, and to what extent, James satisfied those terms must be addressed. If James did satisfy those terms fully or in part, the question of whether he satisfied those terms to a sufficient extent to justify taking the agreement out of the statute of frauds also must be addressed.

Whether the finder of fact will ultimately accept James's version of the facts, including his explanation for why the additional payments were made on the AgStar mortgage note, remains to be seen. But, under the applicable standards of review, we are convinced that the district court, on this record, was required to have allowed the case,

---

[5] That James did not seek a new trial or otherwise revisit the statute-of-frauds question after the district court decided that issue and determined the appropriate compensation owed James on his unjust-enrichment claim does not mean that the statute-of-frauds question is not properly before us in this appeal. James appealed the JMOL. One basis for the JMOL was the statute of frauds. Moreover, the scope of review on appeal from a judgment when there is no motion for a new trial includes the questions litigated at trial. *See Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 311 (Minn. 2003) (ruling that a motion for a new trial is not a prerequisite for appellate review of a substantive question of law that was previously considered and addressed by the district court). And it is undisputed that, in district court, James vigorously opposed the application of the statute of frauds. The statute-of-frauds issue was preserved for appeal.

14

and the vigorously disputed issues of fact, to have gone to the jury. We therefore reverse the district court's grant of JMOL and remand for further proceedings.

If the resolution of the remanded questions necessitates alteration of the district court's resolution of other matters involved in the case, the district court shall have discretion to adjust its other rulings accordingly.

**Reversed and remanded.**

**HARTEN**, Judge (dissenting)

In my view, the district court, having issued a JMOL that the statute of frauds would invalidate any oral agreement for the transfer of land between appellant and his parents, did not err in issuing a JMOL that no such agreement existed rather than ask the jury to determine whether an invalid oral agreement to transfer land existed. "If an action includes both legal and equitable issues, the legal issues are triable by a jury and the equitable issues by the court." *Storms v. Schneider*, 802 N.W.2d 824, 829 (Minn. App. 2011) (quotation omitted), *review denied* (Minn. 26 Oct. 2011).

The history of this action itself demonstrates that JMOL was an appropriate resolution. In his original complaint, appellant alleged three counts against his father's (Dilman Christie's) estate and his mother, Dorothy Christie (then still living): (1) breach of his alleged oral agreement with them to return to him property they had purchased from him, based on their sale of some of that property to his brother Charles; (2) promissory estoppel, based on appellant's payment of his parents' mortgage in reliance on that alleged oral agreement; and (3) unjust enrichment, based on appellant's payment of his parents' mortgage and on improvements he made to their property. Thus, the complaint treated appellant's payment of the mortgage as the basis of his two equitable claims, not as part of his breach of contract claim. Although the complaint was based on alleged oral contract for the transfer of real property, it did not address the statute of frauds or the part performance exception to the statute of frauds. Moreover, the complaint was never amended to assert that appellant's mortgage payment was part

D-1

performance of his alleged oral agreement and took that agreement out of the statute of frauds.

The complaint sought specific performance of the oral agreement by having Dorothy Christie, who had become the sole owner of the property at Dilman Christie's death under the terms of his will, return the property to appellant. But the property was at that time also the subject of two contradictory sets of documents. First, Dorothy Christie's 2011 will, like Dilman's, provided that, when one of them died, the property would belong to the survivor, and, when that survivor died, the property would be part of an estate to be divided equally among their five children, two of whom, namely, appellant and his brother Charles, were given an option to purchase a part of the property from the estate at its fair market value. Second, and in direct contradiction to those wills, a 2012 set of quitclaim deeds signed by Dorothy and Dilman and recorded with the relevant counties transferred the property to appellant subject to the mortgage being satisfied.

Dorothy Christie and Dilman Christie's estate counterclaimed for a rescission of the quitclaim deeds, alleging undue influence on both parents and Dilman's incapacity to contract. This became a significant trial issue because, if the quitclaim deeds were found to be valid and enforceable, appellant's action to acquire the property was moot for three reasons: (1) he was already the owner and had been the owner since he paid off the mortgage in May 2012, before either of his parents died; (2) the property had never been part of either of their estates; and (3) both the alleged oral agreement and the parents' wills were irrelevant if the property had already been transferred to appellant by the quitclaim deeds. If, however, the quitclaim deeds were rescinded, the ownership of the

property remained disputed: appellant claimed to own it under the alleged oral agreement, and Dorothy Christie claimed to own it under Dilman's will.

Confusion as to both what the issues were and who would resolve them was still prevalent shortly before the end of the five-day trial. Respondents' attorney told the district court there were two unresolved issues: (1) "the election of remedy by [appellant]. . . . They still haven't told me whether they're seeking specific performance or money damages for the alleged contracts regarding the land" and (2) "not knowing what's going to be [decided by] you [i.e., the district court], what's going to be [decided by] the jury, and that interplay between the various legal issues." The district court replied, "[C]ertainly if we're . . . down to [all] equitable issues, then this court is going to have to make that decision. . . . [S]pecific performance is an equitable remedy that would require the court to make that decision. If, in fact, it's a money damages question, . . . that would appear to be one that needs to be decided by the jury."

After respondents rested their case, the attorneys again conferred with the district court. The district court said, "And we're now back to the argument of those matters regarding equitable [issues that] are decisions for the court to make; is that correct?" Appellant's attorney answered, "That's correct." Respondents' attorney said, "It would be helpful . . . to have a court determination of whether or not [the quitclaim deeds] are enforceable documents"; appellant's attorney did not disagree. Both attorneys then delivered their arguments on the issue of rescission of the quitclaim deeds. The district court announced its decision to rescind in a JMOL, agreeing with respondents that both parents had been subjected to undue influence and appellant's father had lacked the

capacity to contract. After the district court announced the JMOL, appellant's attorney did not challenge it either substantively (arguing that the quitclaim deeds were valid and enforceable) or procedurally (arguing that the rescission issue should have gone to a jury).[1]

Respondents' attorney then said that respondents would seek JMOL "with respect to the claim that there was an oral agreement with Dorothy Christie. There is no evidence in this case of any meeting of the minds with Dorothy Christie regarding the alleged oral agreement. . . . [Appellant] did not testify that he had some type of communication with [Dorothy] which established that there was an agreement." Appellant's attorney said:

> The evidence is clear from Dorothy Christie's testimony that she acquiesced to the will of her husband with regard to the things that were going on in the farm . . . .
>
> . . . So if Dilman agreed to it [i.e., the oral agreement to return the property to James,] Dorothy acquiesced to his will in that agreement and went along with it. And we certainly don't have any specific information about her saying yes, I have an agreement with my son, because she didn't know anything about anything really.

Thus, appellant's attorney did not dispute that any agreement Dorothy had with appellant to return the property to appellant was contingent on Dilman having had such an agreement with appellant.

The district court then asked the attorneys if: (1) appellant had sold all his interest in the property to his parents; (2) the parents had owned the property in joint tenancy; and

---

[1] Appellant does not challenge the JMOL on rescission of the quitclaim deeds on appeal.

(3) when Dilman died, all his interest in the property was transferred to Dorothy.  The attorneys answered all three questions in the affirmative.  The district court concluded that:

> [T]he estate of Dilman Christie has no interest in that real estate that [appellant] can make a claim on.  It is assets then in the estate of Dorothy Christie that [are at issue] . . . .
>
>            . . . .
> I think ultimately it gets to the issue of can I hold this [alleged oral] contract against Dorothy Christie who really knew nothing about [it].  And she has the entire interest [in the property] in her estate, and there's [no] . . . interest in the estate of Dilman Christie.

The district court then asked the attorneys for their input on the statute of frauds issue.

Appellant's attorney replied:

> [T]he evidence has shown that at the time the property was transferred from [appellant] to Dilman and Dorothy Christie, that there was a simultaneous [oral] agreement that he could get it back when the mortgage was paid off. . . .  [Appellant would] make $190,000 of principal payments [on the mortgage].  If there was not an [oral] agreement between [him] and Dilman and Dorothy to do that, there is no explanation whatsoever for him to prepay his parents' debt and to give them $190,000.

Respondents' attorney provided an alternative plausible explanation for appellant's mortgage payments.

> I think [appellant] saw that codicil from the 2004 will [saying that he could repurchase the land from their estate for what they had paid him for it] and he figured, well, some day I'm going to be able to get this land, as I've seen [in] the [2004] codicil to the will.  And from there he extrapolated that he had some type of ownership interest in that land.  Then he decided that he was going to stop filing his tax returns and that he was going to start taking money from third parties to avoid anyone tracing where the money [was] going.  So he's

D-5

> having third parties buy down the mortgage and, for a lack of a better expression, launder the money that way.[2]
>
> . . . [I]t sure looks like that happened. And that is more than a plausible explanation for what's really going on here. . . . [Appellant] misunderstands what the transaction was in '04, there never was really a meeting of the minds. . . . [H]e fail[ed] to get a written document that he should have that really would [provide] clear knowledge back and forth as to exactly what the agreement was, and now it has collapsed.

From the attorneys' conflicting explanations of appellant's reason for paying off the mortgage in response to the district court's request for input on the statute of frauds, the district court inferred that their argument was actually whether appellant's mortgage payments were a part performance of the alleged oral agreement that took that agreement outside the statute of frauds.

The determination of whether the statute of frauds has been satisfied is generally a question of law. *Upsher-Smith Labs. v. Mylan Labs., Inc.*, 944 F. Supp. 1411, 1425 (D. Minn. 1996). Thus, it is appropriately resolved by a district court, not by a jury. The statute of frauds provides that "[e]very contract for . . . the sale of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party by whom the lease or sale is to be made . . . ." Minn. Stat. § 513.05 (2014). But an exception exists: "[t]he part performance which will make an oral contract to convey real property specifically

---

[2]Appellant had testified that he had not filed tax returns from 2009 through 2012; when asked why he had not, he answered: "I was mainly concerned with reducing the principal on this [mortgage] note" and "I needed to put my money towards the purchase of these farms." He had also testified that he did not have the third-party checks run through his own accounts but endorsed them and paid them to the lender.

enforceable must be done in reliance upon and in pursuance of an existing contract." *Ruble v. Ruble*, 234 Minn. 15, 17, 47 N.W.2d 420, 422 (1951). Part performance occurs when a party, under an oral contract for the transfer of an interest in the land, takes possession and makes partial payment of the purchase price, relying on and with reference to the vendor-vendee relationship. *See Shaughnessy v. Eidsmo*, 222 Minn. 141, 147, 23 N.W.2d 362, 366 (1946) (noting that part performance occurred when a purchaser took possession of land under an oral contract and made partial payment of the purchase price in reliance on the vendor-vendee relationship that existed between the parties); *Bresnahan v. Bresnahan*, 71 Minn. 1, 6, 73 N.W. 515, 518 (1897) ("Possession, however, must be taken with the specific intent of carrying out the contract, and the intent cannot be shown by the oral contract of the parties.").

The district court issued a JMOL that no part performance had occurred to take the alleged oral agreement outside the statute of frauds, stating

> [Appellant] continued in possession of that property under the terms of the [written] lease. Not pursuant to the terms of what he alleges was the oral agreement that he had with [his parents] but pursuant to the terms of the lease. . . . [He] never did take possession of the property under the terms of that oral agreement but he took possession of [it under] the terms of a written lease agreement.

The district court also stated:

> If, in fact, we believe in [appellant's oral agreement], I'm not sure why that lease would have been necessary. They should have just [had their lawyer prepare a] document that would have indicated the terms of that [oral] agreement, but they didn't. They did a lease.

Interwoven with that determination that any oral agreement to return the property would have been invalidated by the statute of frauds was a determination that there had in fact been no such agreement between appellant and either of his parents.

"'[S]tandards for granting summary judgment and for granting [JMOL] are the same.'" *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 918 (Minn. 2009) (quoting *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 545 n.9 (Minn. 2001)). One such standard is "that there is no genuine issue of material fact for trial when the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) (relying on *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986)). The nonmoving party must show that an inference is "'reasonable,' rather than merely possible, in light of the competing inferences." *DLH*, 566 N.W.2d at 70 (quoting *Matsushita*, 475 U.S. at 588, 106 S. Ct. at 1356). In my view, the inference that appellant had an oral agreement with his parents for the transfer of real property is no more than merely possible, and certainly not reasonable, in light of the inferences from the district court's unchallenged findings.

First, and perhaps most obvious of these findings, was:

> [I]n this particular matter . . . there [is], in fact, . . . no written document. There certainly was substantial opportunity for the parties in this case to execute that type of document over the

many years that this has been in existence, basically from 2004 until the death of Dilman Christie. I'm not sure why that didn't happen, and I didn't hear any evidence on why that didn't happen.

As to Dorothy Christie, the district court found that:

> [B]y clear and convincing evidence, . . . Dorothy Christie did not know what was going on here. She was not a party to any agreement, whether . . . a written contract or an oral agreement with [appellant] regarding a possible return of [the] property back to him.
> . . . .
> [For a contract between her and appellant to exist], there had to have been some knowledge on the part of Dorothy Christie that this oral agreement [between appellant and Dilman Christie] even existed. I did not find that in the evidence here. . . .

As to Dilman Christie, the district court found that both the codicil to the 2004 will and the 2011 will indicated that the alleged oral agreement could not exist.

> [When] this transaction [i.e., appellant's sale of the property to his parents] took place, . . . a codicil to [Dilman's] will . . . was drafted. . . . [I]n that codicil he indicated that he . . . was giving [appellant] an option to purchase [the property]. An option to purchase legally is totally different than the agreement that [appellant] said that he had with [Dilman] . . . [and is] a totally different arrangement [from what] I understood that [appellant] felt that he and [Dilman] had agreed to [i.e., that the property would be returned to James when the mortgage was paid].
>
> So I'm not finding that[,] based upon the written actions of Dilman Christie after the original transaction, . . . he had the same understanding of the terms and conditions that [appellant] did. And that's what's important in this case. Later on Dilman Christie did another will. And again, that purported agreement is not in that document. Could have been, should have been, wasn't. . . . Dilman Christie's actions [indicate] he did not . . . understand the terms and conditions of the [alleged] oral contract . . . .

D-9

The district court also made findings as to the inactions of Dilman Christie.

> [T]he people most important . . . in Dilman's . . . life did not know about this supposed oral agreement, including his wife; his accountant; his loan officer . . . ; his attorney . . . ; and other members of [his] family. All of those people who should have and had any number of opportunities to have Dilman Christie tell them what that agreement was—none of them knew about it.

The inference that the oral agreement existed, supported only by appellant's assertion, is at best possible, and certainly not reasonable, in light of the competing inference that it did not, supported both by documents, such as the 2004 codicils and the 2011 wills, and by the testimony of Dorothy and others familiar with Dilman and his business practices, none of whom ever saw or heard any indication that the alleged agreement existed.

The evidence opposing the existence of the oral contract was closely related to, and in some instances overlapped, the evidence as to whether part performance would render the statute of frauds inapplicable to the oral contract, and the JMOL that the statute of frauds applied implied a determination that no oral contract had existed. The district court concluded the explanation of the JMOL by saying:

> I'm finding that the statute of frauds is applicable here. I find that there is no part performance that would take this out of the statute of frauds and, therefore, that oral contract—alleged oral contract is not valid. Therefore, as a matter of law, I'm granting [respondents'] request for judgment [as a matter of law] in that particular matter.
>     Now, I think that leaves us with the issue . . . of the amount of money that's owed on the various notes and obligations.

At this point, appellant's attorney did not object to the determinations that there was no part performance and that the alleged oral contract was not valid; he did not challenge the determination of these matters on JMOL; and he did not say a jury needed to determine whether there had been an oral contract. Instead, he responded to the district court's reference to the amounts of money each party owed the other by raising another issue to be decided on JMOL, namely appellant's equitable unjust enrichment issue, which was based on the premise that his mortgage payments unjustly enriched his parents. Appellant's attorney said, "[W]e also have the issue with regard to the unjust enrichment, which was an equitable issue with regard to the prepayment of principal that was pled." The district court granted appellant's unjust enrichment claim: "[T]he amounts that [appellant] paid as an advance on that mortgage . . . I believe that the estate should be responsible to pay those amounts back to [appellant]." Thus, appellant prevailed on the unjust enrichment claim he brought to recover the mortgage payments he had made from the estates. As he himself stated, he had pled that those payments were unjust enrichment, not that they were part performance of the alleged oral contract.

In treating the mortgage payments as the basis of an equitable unjust enrichment claim and seeking reimbursement of the amount he had paid, appellant indicated that he had not incurred the "unjust and irreparable injury" required for enforcement of an oral contract for the transfer of land. *See Burke v. Fine*, 236 Minn. 52, 55, 51 N.W.2d 818, 820 (1952) (stating that a plaintiff must show that his acts of part performance in reliance

D-11

on an oral contract would result in "unjust and irreparable injury" to him if the contract is not enforced).[3]

In determining whether part performance of the alleged oral contract had occurred, the district court necessarily examined the only evidence supporting the existence of such a contract, i.e., appellant's own testimony, and all the evidence opposing the existence of such a contract, i.e., the parties' wills, the rescinded quitclaim deeds, and the testimony of all the other witnesses. But even if the evidence had been more evenly distributed so that it would sustain "two or more inconsistent inferences so that one inference [would] not reasonably preponderate over the others," the JMOL would have been appropriate because appellant had not sustained his burden of proof. *Wall v. Fairview Hosp. & Healthcare Servs.*, 584 N.W.2d 395, 405 (Minn. 1998) (quotation omitted) ("A district court may grant a motion for [JMOL] when, as a matter of law, the evidence is insufficient to present a question of fact to the jury."). Here, as a matter of law, any oral agreement transferring the property to appellant, if one existed, would have been invalid under the statute of frauds.

JMOL should be granted in unequivocal cases where, in the light of the evidence as a whole, the opposite verdict would be contrary to either the entire evidence or the applicable law. *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711

---

[3]As an alternative basis for a part performance claim, *Burke* provides that the claimant may show that his relationship with the other party "cannot reasonably be explained except by reference to some contract between them." 236 Minn. at 55-56, 51 N.W.2d at 820. Here, the relationship between appellant and his parents is easily explained without any reference to the alleged oral contract, as numerous witnesses testified and as the parents' wills show.

N.W.2d 811, 816 (Minn. 2006). "Viewing the evidence in a light most favorable to the nonmoving party, this court makes an independent determination of whether there is sufficient evidence to present an issue of fact for the jury." *Id.* The district court necessarily determined whether part performance of the alleged oral contract would preclude the application of the statute of frauds, and that determination necessarily involved a consideration of whether the alleged oral contract did in fact exist. I see no error in the district court's thorough and carefully reasoned JMOL.